Rathmell *v.* Wesleyville Borough, Appellant.

Argued October 4, 1943. Before KELLER, P. J., BALDRIGE, STADTFELD, RHODES, HIRT, KENWORTHEY and RENO, JJ.

*Alban W. Curtze,* of *Brooks, Curtze & Silin,* for appellant.

*William W. Knox,* with him *Robert J. Firman,* for appellee.

OPINION BY RENO, J., January 27, 1944:

The compensation authorities and the court below sustained the employe's claim. His employer's argument on its appeal states only one question: Did the claimant suffer an injury by an accident in the course of his employment within the meaning of the Workmen's Compensation Act?

Claimant was a part-time policeman for the Borough of Wesleyville and was otherwise employed by the General Electric Company at its Erie plant. On March 7, 1940, he was directed by the burgess to escort the funeral of the president of the borough council to the

cemetery at North East, a distance of twelve miles. His usual duties as a policeman required him to patrol the borough on foot or in an automobile, and this was the first time he was required to drive a motorcycle. There was no windshield on the motorcycle; although he wore leather gloves, he felt severe pains and numbness in his hands; and when the funeral was over, he noticed that his fingers had turned white. He went to a gas station, where a woman ran cold water on his hands, and her husband rubbed snow upon them to restore circulation. Upon his return to Wesleyville he went to the home of the borough treasurer, where he and his wife assisted him in massaging his fingers. Apparently, he had experienced a severe chilling of his hands, but not amounting to what the medical profession recognizes as a frostbite. The average temperature during the time of the funeral was about 28 degrees, below the freezing point, and there was a twelve mile an hour breeze.

Notice of the occurrence was given to the borough the following morning, and, although he still experienced pain, he continued his work with the General Electric Company. In July, 1940, he received treatment at the first aid section of the General Electric Company and, his hand still continuing to pain him, in September, he consulted Dr. R. N. Chaffee, who diagnosed the condition as ischemia. The prescribed treatment did not produce the desired result and on September 23, 1940, the middle left finger was amputated at the first joint, followed in October by the amputation of the remaining portion. In March, 1941, the right middle finger was amputated.

Following the first amputation, Dr. Chaffee made a diagnosis of Buerger's disease. This is a disease, chronic in character, which causes inflammation of the lining of the arteries, producing clotting of the blood, and ultimately gangrene. Dr. Chaffee testified that claimant's exposure to the cold weather resulted in the

aggravation of a condition which, at the time, was existing without claimant's knowledge. Upon the basis of that testimony, and other evidence to which we shall refer, the referee found and the board affirmed, that the injuries were the result of an accident which occurred on March 7, 1940, and made an award to claimant under §306(c) of the Workmen's Compensation Act and "a suspended award of compensation for an undetermined partial disability until such time as he sustains a loss of earnings by reason of said partial disability."

Dr. Chaffee's testimony to which we have referred, was fully corroborated by Dr. C. W. Fortune, claimant's witness. Dr. John P. Henry, called by the employer, was of the opinion that claimant was suffering from a vaso-spastic disease of both hands, known as Raynaud's disease. He distinguished Buerger's disease from Raynaud's disease in that the former is a sub-acute inflammatory state involving the arteries and veins, with a tendency toward gangrene, and it is organic in character. Raynaud's disease, he described as an excitable vaso-spastic state, in which the vessels go into spasm, with resultant ischemia and loss of tissue; that the two diseases are related only in that they both involve arteries, and they both go on to resultant gangrene and loss of tissue. He was asked: "Q. If it was shown that due to his fingers becoming cold and numb on this particular day in March, and due to that he had to have the middle finger amputated, would you say his loss of gripping power was due to that coldness on that day? A. I think the exposure to cold precipitated his vaso-spastic state, which in turn set up a mechanism which produced this condition. Q. Now you know he testified that he never noticed anything about his hands and fingers until the day of this exposure. Now is that possible with a vaso-spastic—A. That's the usual history. There is always some trigger to release this

nervous catastrophe or mechanism which results in this sort of a picture." On cross-examination, he testified: "Q. But they [fingers] could have been severely chilled? A. Oh, definitely. Q. And that would have brought about this condition, would it not? A. To set up the spasm? Q. Yes. A. Oh, it evidently did."

Dr. R. H. Luke, another of the employer's witnesses, testified that claimant had Raynaud's disease. In direct examination he was asked: "Q. Do you believe a 29 degree temperature would cause a chilling which would superinduce a vaso-spastic disease, precipitate it? A. No, but in the presence of a vaso-spastic disease you will get an abnormal amount of blanching of the fingers, as is complained of in this case." On cross-examination: "Q. ...... this Raynaud's disease. What is it? A. It is a spasm of the small peripheral blood vessels. Q. Will this chilling produce that spasm of that small blood vessel? A. Yes. Q. And that could be brought about just as it has been related here? A. True."

Thus, while they differ in their diagnosis, the medical witnesses on both sides substantially agreed that a pre-existing disease, whether it was Buerger's or Raynaud's, was aggravated or precipitated by the events which have been described.

The salient finding of fact is: "Ninth. The loss of claimant's middle left finger and middle right finger resulted from a vaso-spastic disease which was precipitated by his exposure to cold on March 7, 1940." The other important findings relate to the incidents of the occurrence, claimant's assignment to an unusual duty which took him out of the ordinary course of his employment, the drive in a motorcycle without a windshield, the severely chilled hands, and the immediate report to the borough officials. The findings are supported by competent, substantial and direct evidence. The ultimate conclusion is that claimant's unusual ex-

perience aggravated a pre-existing condition, precipitated a latent and unknown condition, and caused the disability which he sustained. There was a "happening to an employee of something undesigned, unexpected or fortuitous, outside of the ordinary course of events and also ...... a disabling injury resulting therefrom": *Royko v. Logan Coal Co.*, 146 Pa. Superior Ct. 449, 457, 22 A. 2d 434. The case definitely falls within the second class of cases described in the *Royko* case, supra, p. 460, and the rule there stated governs this case. To paraphrase that description, the claimant's pre-existing chronic condition was so aggravated that disability ensued and the aggravation is attributable to an external, unexpected, fortuitous and untoward, occurrence aside from the usual course of events, amounting to an accident within the meaning of the statute, and, therefore, the injury is compensable. In some respects, it resembles *DeEsch v. Emmaus Borough*, 143 Pa. Superior Ct. 225, 18 A. 2d 89, where it was held that it was not in the ordinary course of a policeman's duty to remove a heavy drunken man, struggling down a narrow stairway from a second floor, using for that purpose more force than usual, and that the combination of these elements in one arrest was fortuitous and constituted an accident which aggravated a pre-existing heart condition.

These cases were decided after *Adamchick v. Wyoming Valley Collieries Co.*, 332 Pa. 401, 3 A. 2d 377, and follow it. The *Adamchick* and cognate cases, *Harring v. Glen Alden Coal Co.*, 332 Pa. 410, 3 A. 2d 381, and *Crispin v. Leedom and Worrall Co.*, 341 Pa. 325, 19 A. 2d 400, may be laid aside in the discussion of this case; for, as explained by Judge KENWORTHEY in *Buck v. Arndt*, 153 Pa. Superior Ct. 632, 34 A. 2d 823, their impact is largely upon the question of the quantum of proof. Here, there can be no question "whether there is evidence sufficient in quantity and quality to support

findings that the injury resulted from the performance of the work and was unforeseen and unexpected."

Although it does not deal with a pre-existing disease, and, therefore, is not controlling, *Parks v. Miller Printing Machine Co.*, 336 Pa. 455, 9 A. 2d 742, is a helpful authority. It classifies in the second group of the types of cases therein reviewed, those cases where "there occurs an unexpected and unusual pathological result; that is to say, where the accident resides in the extraordinary nature of the effect rather than in the cause", and includes in that category the sunstroke and heat prostration cases. "These rest," said Mr. Justice STERN, "upon the theory that the prostration is not the natural, probable and predictable result of an exposure to the prevailing conditions, but constitutes an extraordinary and unlooked-for mishap visited suddenly upon the employe while at work." A footnote to the case (p. 459) indicates that frost-bites are included in the group. Of course, we do not have a frost-bite here; but we do have a severe chilling; and the difference between them is only one of degree, and that, under the testimony, a minor degree. The *Parks* case is relevant at least to this extent: it distinctly teaches that a severe chilling, akin to a frost-bite, producing an unexpected result, under normal conditions for the time and place of the occurrence might in some circumstances constitute an accident. When there is added the element of abnormal and unusual work outside of the ordinary course of duty, the inescapable conclusion is that a compensable accident has occurred.

The cases relied upon by appellant do not control this case. *Good v. Pa. Dept. of Property and Supplies*, 346 Pa. 151, 30 A. 2d 434, relates to a claimant with a pre-existing heart condition whose death occurred while he was doing a normal part of his work. In *Pryor v. Sweet's Steel Co.*, 151 Pa. Superior Ct. 99, 29 A. 2d 434, claimant was performing his usual duties. *Moyer*

*v. Union Boiler Manufacturing Co.,* 151 Pa. Superior Ct. 477, 30 A. 2d 165, was a case of pneumonia contracted in the usual course of employment without extraordinary circumstances, a "fourth group" case according to the classification supplied by the *Parks* case, supra, p. 461. *Bird v. Brown,* 148 Pa. Superior Ct. 534, 25 A. 2d 857, was a hernia case, occurring before the legislative enactments upon that subject, which was returned to the board for taking additional testimony, but it recognizes that a claim may be sustained where the injury was not the natural or probable result of what claimant was doing at the time of the injury. In *Lakott v. Armour & Co.,* 147 Pa. Superior Ct. 597, 25 A. 2d 77, the board found that the claimant had Buerger's disease, that the atmosphere of the refrigerator room in which he worked for eight years was not abnormally high on the day he alleged he was frost-bitten, that he had not been exposed to unusual conditions; and, since there was sufficient testimony to support the finding of the board that there was no accident, this court affirmed.

Judgment affirmed.

DISSENTING OPINION BY KENWORTHEY, J.:

Since there is evidence, if believed by the board, to support it, I must concede that the exposure of his hands to the cold on March 7, 1940 played a sufficient part in the ultimate development of claimant's disability to entitle him to compensation, provided what occurred on that date amounted to an accident within the meaning of the Workmen's Compensation Law. But I cannot agree that it did.

Clearly the pathological result of what happened cannot be said to have been so unexpected as to have amounted to an accident, per se.[1] Whether claimant

---

[1] "..... where the work or act performed by the employe is voluntary, and not marked by any abnormal or unusual feature,

was suffering from Buerger's Disease (described in the opinion of the majority as "a subacute inflammatory state involving the arteries and veins with a tendency toward gangrene"), or Raynaud's Disease (described as "an excitable vaso-spastic state, in which the vessels go into spasm, with resultant ischemia (loss of blood) and loss of tissue"), the condition existed prior to March 7, 1940, and, on the testimony of claimant's own physician called as his witness, the development cannot be said to have been unexpected. He testified, "I think he had Buerger's Disease and did not know it," and, "It is an aggravation of the condition which at that time was existing without his knowledge." As to the things which might precipitate the effects of the disease, he testified, "It could have been anything that would cause it;" "if he went swimming in some very cold water, diving into cold water, that that could aggravate it ...... just the same as though wind hit you, exactly the same," that "just the slightest kind of cold hitting his hand, driving in an open car unprotected, or motorcycle," would precipitate the trouble. If a healthy workman exposes himself to the rays of the sun and suffers a heat-stroke, he is entitled to compensation "upon the theory that the prostration is not the natural, probable and predictable result of an exposure to the prevailing conditions, but constitutes an extraordinary and unlooked-for mishap visited suddenly upon the employe while at work." [2] The evidence clearly rules out any notion that we, here, have such a case. Since there was no external accident in the sense that term is commonly understood, if the claimant is entitled to recover on any theory, it must be on the

but where there occurs an unexpected and unusual pathological result; that is to say, where the accident resides in the extraordinary nature of the effect rather than in the cause." *Parks v. Miller P. Mach. Co.,* 336 Pa. 455, 459, 9 A. (2d) 742.

[2] *Parks v. Miller P. Mach. Co.,* supra at 459.

ground he has shown "an unusual and suddenly develping concatenation of circumstances which necessitates impulsive rather than deliberate action and under conditions markedly different from those attendant upon the usual course of the employe's regular work."[3]   In *DeElsch v. Emmaus Boro.*, 143 Pa. Superior Ct. 225, 18 A. (2d) 89, relied on by the majority, we held that the emergency arising in the course of claimant's employment was sufficiently unusual to meet the test.   Compensation has been allowed in such cases as *Jones v. Phila. & Reading Coal & Iron Co.*, 285 Pa. 317, 132 A. 122, where the employe was suddenly called upon to attempt the rescue of his father who had been buried by the slide of a culm bank, the effort lasted 2½ hours, the employe was drenched with water and the exposure caused pneumonia; in *Heisler v. Lincoln Realty Co.*, 121 Pa. Superior Ct. 516, 184 A. 305, where the janitor of a building was called upon to turn off steam escaping through a break in the pipe and, in doing so, was compelled to walk on the street in extremely cold weather and then for a short distance through the hot steam, whereby his clothing became wet and a day or two later he developed bronchial pneumonia; in *Roth v. Locust Mountain State Hospital*, 130 Pa. Superior Ct. 1, 196 A. 924, where a surgeon was called upon to perform an emergency operation in a dispensary where the temperature was abnormally low, as a result of which he contracted influenza-pneumonia.

I am unable to fit the present case into the pattern of the decisions in which compensation has been allowed. Claimant was a relief or part-time patrolman.   Ordinarily, his duties consisted of patrolling the borough in his own automobile or on foot.   On the day in question, he was directed by the Burgess to escort a funeral to North East Cemetery, a distance from the borough

---

[3] *Parks v. Miller P. Mach. Co.*, supra at 460.

of approximately eleven or twelve miles. There is nothing in the record to indicate that he used a motorcycle as the result of an emergency or any other unusual occurrence. Although, in my opinion, it would not affect the result, he did not even say that he was instructed to use the motorcycle rather than his automobile. Apparently for no explainable reason, he borrowed the motorcycle from a friend, borrowed a pair of gauntlet gloves from the Pennsylvania Motor Patrol and embarked on the undertaking of his own free will. Nothing unusual or anything unforeseen occurred in the course of the trip. Not even the weather was unusual; the temperature ranged between 26 and 30 degrees, the wind was "moderate." Although he had never before ridden a motorcycle in the performance of his duties, this court has never held that the mere performance by an employe of his work in a manner somewhat different from that usually employed is sufficient to constitute an accident; we have held just the opposite. In *Ferraro v. Pittsburgh Term. Coal Corp.*, 142 Pa. Superior Ct. 22, 29, 15 A. (2d) 559, where the evidence revealed that the departure from claimant's ordinary routine of labor was the necessity for him occasionally to shovel left-handed this court said: "It need only be remarked that while an accident is necessarily something unusual, it does not follow that every unusual occurrence, or deviation from the usual manner of performing work, amounts to an accident." I think, as a test to be used in this class of case, the language of Mr. Justice STERN quoted above cannot be improved upon. And applying it here, I am unable to find either "an unusual and suddenly developing concatenation of circumstances which necessitate[d] impulsive rather than deliberate action" or "conditions markedly different from those attendant upon the usual course of the employe's regular work."

The exposure was nothing more than the trigger

which touched off the symptoms of claimant's unfortunate disease. I fail to find anything in the record to indicate either that the exposure was so unusual or the result so unexpected as to constitute an accident within the meaning of the Workmen's Compensation Act.

I would, therefore, reverse the judgment and enter it for appellant.